**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BAY VALLEY FOODS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 23 C 14524** |
| | ) | |
| **FFI GROUP, LLC and KRAMER** | ) | |
| **CORPORATION OF GA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Bay Valley Foods, LLC, has sued FFI Group, LLC and Kramer Corporation of GA regarding the sale of dehydrated chopped onions. Bay Valley alleges that FFI and Kramer breached their contracts with Bay Valley, as well as certain warranties, when they delivered onions contaminated with metal fragments. Specifically, Bay Valley alleges that FFI and Kramer breached express warranties contained in certain contracts in violation of Uniform Commercial Code § 2-313 (Counts 1 and 2); the implied warranty of merchantability, U.C.C. § 2-314 (Counts 3 and 4); and the implied warranty of fitness for a particular purpose, U.C.C. § 2-315 (Counts 5 and 6). Bay Valley further contends that, based on the terms of the contracts underlying the sale, FFI and Kramer owe it an express duty to indemnify it for all losses resulting from the allegedly contaminated onions (Counts 7, 8, and 9).

Kramer, in turn, has filed a crossclaim against FFI alleging that it breached the implied warranty of merchantability (Count 3) and the implied warranty of fitness for a

particular purpose (Count 4), U.C.C. §§ 2-314 and 2-315, when it sold the onions to Kramer before they were ultimately delivered to Bay Valley.  Kramer also alleges both express and implied indemnification (Counts 1 & 2) for resulting losses.

Bay Valley has moved for partial summary judgment—as to liability only—on all of its claims except counts 5 and 6 (breach of the implied warranty of fitness for a particular purpose against Kramer and FFI, respectively).  FFI and Kramer have separately moved for summary judgment against Bay Valley.  FFI and Kramer have also filed cross-motions for summary judgment on Kramer's claims against FFI.

## Background

This case centers on dehydrated chopped onions.  Though the subject matter of the suit might seem simple, the underlying issues appear to be anything but.  According to Bay Valley, it received onions that were contaminated with metal fragments, which it then unknowingly incorporated into salsa that was distributed to the public.  FFI and Kramer are two parts of Bay Valley's supply chain for the onions. As a result, most of the issues in this case involve determining who owes what warranties to whom and who is responsible for indemnifying whom for any losses resulting from the contaminated onions.

Bay Valley is an Illinois-based food manufacturer of private label foods and beverages.  One such food product is salsa, which is made using dehydrated onions. Bay Valley manufactures this salsa at facilities located outside Illinois, including, as relevant to the present action, in Texas, Kentucky, and Canada.  Several customers complained about purchasing salsa manufactured at the Kentucky facility that contained fragments of metal wire, roughly an inch long.  Due to these complaints, Bay Valley

halted production and distribution of the salsa to investigate where the contamination had occurred, leading them to discover metal fragments in previously-unopened containers of dehydrated chopped onions. The original sources of these onions were two India-based producers, Fivestar Dehydration Private Ltd. and Pardes Quick Foods & Dehydration Private Ltd. The onions were delivered to Bay Valley after passing through a supply chain that, according to Bay Valley, included FFI and Kramer.

FFI and Kramer are both suppliers of wholesale food ingredients. Both of them claim on their websites to have decades of experience in the wholesale food industry. *See* First Am. Compl. ¶¶ 15–16. In 2021, Kramer won a bid to supply Bay Valley with chopped onions. Bay Valley alleges that "Kramer and FFI reached an agreement in December 2021 that Kramer would source from FFI the dehydrated chopped onions for the bid that Kramer had won with Bay Valley." *Id.* ¶ 30. As alleged in the complaint, FFI and Kramer entered into a series of agreements to supply dehydrated chopped onions to Bay Valley. Most relevant to the present action, FFI executed continuing product guaranties, and Kramer agreed to terms and conditions contained in purchase orders sent by Bay Valley. *See* Bay Valley's SOF, Exs. 6, 13.

From January through May of 2022, Bay Valley issued eleven purchase orders to Kramer for approximately 410,000 pounds of onions. Kramer issued corresponding sales orders for each purchase order, arranged for delivery of the onions to the location designated on the purchase orders, and accepted payment for them. The onions were then incorporated into salsa at three of Bay Valley's facilities, located in Texas, Kentucky, and Canada.

The problems for Bay Valley arose when it received several customer complaints

3

regarding fragments of metal found in the finished salsa. After receiving a number of complaints, Bay Valley halted production and distribution of its salsa and conducted an internal investigation to determine the source of the metal contamination. It also informed both Kramer and FFI of the issue. As a result of the investigation, Bay Valley determined that the salsa about which the complaints were made had been produced at the Kentucky facility, and it found metal fragments in both finished jars of salsa and sealed containers of onions. The metal fragments were visible to the naked eye, roughly one inch in length. Following the investigation, and after screening the onions and salsa for metal, Bay Valley eventually returned some unopened containers of onions and released the finished salsa for sale.

On October 4, 2023, Bay Valley filed the present action against Kramer and FFI. Bay Valley seeks damages related to the returned onions, the testing involved to determine the source of contamination, and other losses resulting from the delays in producing and distributing the finished salsa. Bay Valley has now moved for partial summary judgment, specifically on the issue of liability, which would leave the issue of damages for the fact-finder to determine. In response, FFI and Kramer have filed cross-motions for summary judgment against Bay Valley. Kramer has also filed a crossclaim against FFI seeking indemnification for breach of express and implied warranties related to the sale of the onions. FFI and Kramer have both filed cross-motions for summary judgment regarding all counts of Kramer's crossclaim.

## Discussion

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists when, after drawing all reasonable inferences from the record in favor of the nonmoving party, a reasonable trier of fact could return a verdict for the nonmovant. *Id.*

The party seeking summary judgment bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the "party that bears the ultimate burden at trial must show that there is evidence creating a genuine issue of material fact." *Insola v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If the party with the burden of proof cannot show that its claim or defense is factually supported, summary judgment against that party is appropriate. *Celotex*, 477 U.S. at 323–24.

## A. All parties' motions for summary judgment on Bay Valley's claims

The Court will begin by addressing the arguments made in Bay Valley's motion for summary judgment and the defendants' cross-motions against Bay Valley.

### 1. Choice of law

As a preliminary matter, FFI disputes which state's law should govern this suit. Though Bay Valley contends that FFI is bound by the choice-of-law provision contained in the purchase orders for the onions, FFI argues that those purchase orders bind only Kramer, as Kramer is the party listed on the orders—not FFI. Illinois state and federal courts have found that forum-selection clauses do not bind non-parties to the contract. *See, e.g.*, *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996) (holding that "[e]ven the strongest language choosing" a particular state's law

does not bind non-parties to the contract); *Maldonado v. Creative Woodworking Concepts, Inc.*, 342 Ill. App. 3d 1028, 1032, 796 N.E.2d 662, 665 (2003) ("[A] choice of law or forum clause is not applicable to a non-party."); *see also Elling v. Hauck*, No. 13 C 8031, 2015 WL 5401653, at *3 (N.D. Ill. Sep. 10, 2015) (collecting cases).

Bay Valley first contends that, even if the purchase orders do not bind FFI, this action is nonetheless governed by Illinois law due to another contract to which FFI is a party. According to Bay Valley, it executed a Confidentiality Agreement with FFI on February 24, 2016 that included an agreement that Illinois law would apply to actions related to its supply of onions to Bay Valley. Bay Valley thus argues that Illinois law applies.

This argument is unsupported by the language in the Confidentiality Agreement. The specific forum selection clause in that document states: "*This Agreement* shall be governed by and interpreted in accordance with the laws of the State of Illinois." Bay Valley's SOF, Ex. 3 ¶ 9 (emphasis added). But the "Agreement" in which that language appears concerns the disclosure of proprietary or confidential information, not the delivery of goods. In other words, the underlying issue of whether FFI made, and breached, express and implied warranties has nothing to do with an agreement not to disclose confidential information. The Court is thus unpersuaded that the Confidentiality Agreement controls the choice-of-law question.

Absent an agreement regarding which state's law applies, in a diversity case like this one, a federal court "'look[s] to the choice-of-law rules of the forum state to determine which state's law applies' to the issues before it." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) (quoting *Heiman v. Bimbo Foods Bakeries Distrib. Co.*,

902 F.3d 715, 718 (7th Cir. 2018)).  Illinois's choice-of-law rules apply the law of the

forum "unless an actual conflict with another state's law is shown, or the parties agree

that forum law does not apply."  *Id.* (quoting *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808

(7th Cir. 2020)).

As an initial step, the Court must determine whether an actual conflict exists

among the laws of the various fora implicated by this action.  The parties primarily argue

that either Illinois or Kentucky law should apply, but they also make arguments

regarding Texas, New Jersey, and Maryland law.  The contacts with Illinois, Kentucky,

and Texas have already been discussed; Illinois is where Bay Valley is located, and

Kentucky and Texas are where onions were delivered and salsa was manufactured.

New Jersey and Maryland, according to Bay Valley, are the locations from which FFI

performed.  Specifically, Maryland is where the onions were initially delivered from

Fivestar, and New Jersey is where FFI's warehouse is located and where the onions

were stored before Bay Valley accepted delivery.

The Court finds that a conflict does exist among the applicable law of the various

fora.  Illinois, Texas, New Jersey, and Maryland recognize exceptions under which strict

privity of contract is not required for express or implied warranty claims.  *See, e.g.*,

*Bakopoulos v. Mars Petcare US, Inc.*, 592 F. Supp. 3d 759, 765 (N.D. Ill. 2022) (noting

that, under Illinois law, "express warranty claims are permitted to bypass the privity

requirement if a manufacturer expressly warranted its good to the ultimate consumers

and this was the basis for the bargain and relied upon by plaintiffs" (internal quotation

marks omitted)); *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 198 (Tex. App.

2003) (finding that, under Texas law, privity of contract is not required for claims of

express or implied warranties); *Gray Const., Inc. v. Medline Indus., Inc.*, No. GLR-19-3405, 2020 WL 5816502, at *12 (D. Md. Sep. 30, 2020) ("The third party beneficiary theory of recovery is a limited exception to the strict privity rule of contracts." (citation and internal quotation marks omitted)); *Powell v. Subaru of Am., Inc.*, 502 F. Supp. 3d 856, 878 (D.N.J. 2020) (finding that "New Jersey law does not have . . . a privity requirement" for claims of express or implied warranties and collecting cases supporting this premise). Because Texas, Maryland, and New Jersey law regarding privity of contract does not conflict with Illinois's law on this point, the Court will proceed by assuming Illinois law controls over these other options. *See Sosa*, 8 F.4th at 637 (finding that Illinois law applies to cases brought in Illinois "*unless* an actual conflict with another state's law is shown" (emphasis added)).

Kentucky, on the other hand, does require privity on claims of breach of express or implied warranties. *See Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 964–68 (E.D. Ky. 2019) (collecting cases). Despite Bay Valley's contention that the court in *Simpson* recognized that express warranty liability may exist despite a lack of privity "where a warranty explicitly stated it was made to the purchaser," Bay Valley's Reply in Supp. of Mot. for Summ. J. Against FFI & Resp. in Opp. to FFI's Cross-Mot. for Summ. J. at 9, the page from that case cited by Bay Valley expresses no such principle. Rather, the cited portion of *Simpson* is merely the district court recounting the plaintiff's argument before proceeding to its analysis, in which the court rejects the proposition that such express warranties are available absent a showing of privity. *Simpson*, 397 F. Supp. 3d at 968 (dismissing plaintiff's claim for express warranty "because [plaintiff] is not in privity with [defendant]").

8

Based on this conflict, it is necessary to determine whether Illinois or Kentucky law controls. Illinois follows the Restatement (Second) of Conflict of Laws, which states that "[i]ssues in contract are determined by the law chosen by the parties in accordance with the rule of § 187 and otherwise by the law selected in accordance with the rule of § 188." *Id.* § 186 (1971); *see also Gunn*, 968 F.3d at 808 ("In general, Illinois follows the Restatement (Second) of Conflict of Laws (Am. Law Inst. 1971)." (citing *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 61, 879 N.E.2d 910, 919 (2007))). Section 187 states that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." *Id.* § 187(1). Though Bay Valley argues that the purchase orders for the onions contain a choice-of-law provision, FFI disputes whether those purchase orders bind it. Thus the Court will proceed by first assuming that FFI is not bound by the purchase orders and thus that section 187 of the Restatement is inapplicable. In that event, the Restatement calls for application of section 188.

Section 188 contemplates situations in which no choice-of-law provision exists. It states that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." *Id.* § 188(1). Section 188 further states that

> [i]n the absence of an effective choice of law by the parties . . . , the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

9

*Id.* § 188(2). These contacts should not be applied in a rigid or formulaic manner; rather, they "are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

FFI contends that Kentucky has the most significant relationship to the transaction because that is the forum where the majority of the onions were delivered. To support this contention, FFI cites *In re General Motors Corp. Dex-Cool Products Liability Litigation*, 241 F.R.D. 305 (S.D. Ill. 2007), for the proposition that "[t]he weight of authority holds that, in cases involving alleged breach of warranty, the state where goods were delivered and where injury occurred has the most significant relationship for conflict of law purposes." *Id.* at 317. According to FFI, "the most rational method" to determine the most significant relationship to the transaction is to look at the quantity of onions sent to each location, "as well as the place where the defective onions were located." FFI's Consol. Mem. in Opp. to Bay Valley's Mot. for Summ. J. & in Supp. of FFI's Mot. for Summ. J. at 12.

Bay Valley argues that Illinois has the most significant relationship and therefore Illinois law should apply. Specifically, Bay Valley contends, it is headquartered and has its primary place of business in Illinois, various agreements related to the sale of the onions were negotiated by Bay Valley employees located in Illinois, and all financial losses were suffered by Bay Valley in Illinois, where its bank accounts are located, and not at the location of any one particular plant. By contrast, Bay Valley argues, the only contact with Kentucky is that it was one of three places where the onions were shipped.

According to Bay Valley, it ordered approximately 410,000 pounds of onions. Bay Valley's SOF ¶ 20. The Kentucky plant received 232,522 pounds of onions, and

10

the Texas plant received 157,696 pounds of onions. FFI's SOF ¶¶ 12–13. All of the onions delivered to the Kentucky plant were incorporated into salsa that was eventually distributed for sale. On the other hand, approximately 56,000 pounds of onions delivered to the Texas plant were not incorporated into salsa. *See* Bay Valley's Resp. to FFI's SOF ¶ 39; Kramer's Resp. to FFI's SOF ¶ 40.[1]

The first two contacts listed under section 188(2) do not significantly impact the choice-of-law analysis involved here. "Standing alone, the place of contracting is a relatively insignificant contact." Restatement (Second) Conflict of Laws § 188 cmt. e (1971). "The place where the parties negotiate and agree on the terms of their contract is a significant contact," but "[t]his contact is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone." *Id.* In this case, the places of contracting and negotiation are afforded little weight. The contracts were negotiated over phone and email, and they were executed in separate states.

The next two factors are somewhat intertwined; they involve consideration of the place of performance and location of the subject matter of the contract. In the present action, these factors overlap—the performance required under the purchase orders is delivery of the onions, and the shipping addresses listed are Bay Valley's facilities located in Texas, Kentucky, and Canada. *See* Bay Valley's SOF, Ex. 13. Accordingly,

---

[1] Bay Valley asserts in its Statement of Facts that it "returned approximately 150,000 pounds of onions to Kramer." Bay Valley's SOF ¶ 64. This assertion, however, is not supported by the exhibit cited there. *See id.*, Ex. 43. The Court will thus proceed on the assumption only that 56,000 pounds of onions could not be incorporated into salsa at the Texas plant, as that is the only statement of fact agreed upon by all parties.

the location of the subject matter of the contract is also spread across these three fora.

"The state where performance is to occur under a contract has an obvious interest in the nature of the performance," but "the place of performance can bear little weight in the choice of the applicable law when . . . performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue."  Restatement (Second) Conflict of Laws § 188 cmt. e (1971).  As noted, onions were delivered in Texas, Kentucky, and Canada.[2]  Although FFI is correct that a little more than half of the onions were delivered to Kentucky and that a little over a third were delivered to Texas, that relatively modest difference doesn't persuade the Court to find that this factor weighs in favor of applying Kentucky law.  One-half vs. one-third, given the volume of onions delivered, strikes the Court as the onions being "more or less equally" shipped to Texas and Kentucky.  Further, on the purchase orders for the onions specifically set to be shipped to Kentucky, the "[t]erms of delivery" lists FFI's warehouse in New Jersey.  Bay Valley took possession of the onions in New Jersey, and it is thus unclear whether Kentucky was ever considered by the parties to be the "place of performance" of the contracts.  Given all of these facts, this factor in the analysis is neutral.

Regarding the location of the subject matter of the contract, "when the thing of risk is the principal subject of the contract, it can often be assumed that the parties . . . would expect that the local law of the state where the thing of risk is located would be applied."  *Id.*  Though FFI is correct that the majority of the onions were delivered to the Kentucky plant, that is not the end of the analysis.  The Restatement expressly states

---

[2] No party argues that Canadian law applies.

that "contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id*. § 188(2). Therefore, the significance of the contacts depends on their relationship to the underlying issues raised. In this case, Bay Valley asserts claims for breach of express and implied warranties related to allegedly adulterated onions. So certainly the place(s) where the onions were delivered is a matter of significance. But what is important is how the delivery impacts the litigation. Bay Valley's claim is that the onions that were delivered breached certain express and implied warranties. If *any* amount of onions do not adhere to these warranties, then FFI and Kramer may be liable. Where more or less of this took place has no real impact on liability.

Further, there is no clear precedent supporting FFI's contention that, when goods are delivered to multiple locations, the strongest contact is the place where the majority of product was delivered. Rather, the case cited by FFI supports the premise that *each forum* has an interest in the litigation. *In re General Motors Corp. Dex-Cool Products Liability Litigation* was a multidistrict litigation proceeding involving claims by owners and lessees of vehicles damaged by a factory-installed engine coolant. The court noted that "the claims of the proposed class for breach of express warranties are governed by the laws of the forty-seven states where the class members reside." *In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. at 318. But despite FFI's contention that the court affirmed the proposition that the most significant relationship lies where the majority of goods were delivered, the court reached no such conclusion. The court determined that each owner or lessee's claim would be governed by the state of its residence and, due to wide variation in the laws of the relevant states, denied the

request for class certification.  *See id.* at 324.  It did not apply an approach that favored the law of the state with the greatest number of deliveries.

The other case relied on by FFI, *Usinor Industeel v. Leeco Steel Products, Inc.*, 209 F. Supp. 2d 880 (N.D. Ill. 2002), serves it no better.  In *Usinor*, the goods at issue were all delivered to Illinois, which also happened to be the location of Leeco Steel's headquarters and its primary place of business.  *See id.* at 886.  Based on these facts, the court determined that Illinois law should apply.  That does not advance the ball here, where the onions were delivered to multiple states, none of which include either party's place of incorporation or primary place of business.

Given the specific facts of this litigation and the claims brought by Bay Valley, the location of the subject matter of the contract appears to bear little weight.  It is not possible to apply Texas law to the onions delivered in Texas and Kentucky law to those delivered in Kentucky.  Bay Valley's claims relate to the entire delivery of product. Should the Court give more weight to Kentucky's interest simply because more onions were delivered there, even though the record suggests that all of those onions were ultimately used at the Kentucky plant?  Or, given the fact that about one-third of the onions delivered to the Texas plant could not be used, does that state's interest get greater weight when one focuses on considering the "relative importance with respect to the particular issue"?  FFI itself makes this very argument.  *See* FFI's Consol. Mem. in Opp. to Bay Valley's Mot. for Summ. J. & in Supp. of FFI's Mot. for Summ. J. at 12 ("[T]he most rational method of determining the 'most significant relationship' is to look at the quantity of onions [sent to each location], as well as the place where the defective onions were located.").  The factors favoring one of those locations over the other

14

effectively amount to a wash.

Having considered all of the relevant factors, the Court concludes that Illinois has the most significant relationship to the litigation. Bay Valley is incorporated and has its primary place of business in Illinois, and the underlying financial loss for which Bay Valley seeks to recover was felt in Illinois. Further, Bay Valley asserted during the motion hearing that the x-raying was done in Illinois, meaning that the discovery of the breach of warranty was not even necessarily linked to any individual plant, but rather was a result of the testing done after customers had reportedly discovered metal in finished salsa. *See* Tr. of July 1, 2025 Hr'g at 18:3–8 (noting that "[t]he largest category [of loss] is the cost of x-raying," which "happened in Illinois" and one other state). These considerations lead the Court to determine that Illinois has the most significant contacts and that Illinois law should thus govern this action.

Because Illinois law applies, the Court concludes that FFI may be held liable to Bay Valley for breach of express and implied warranties despite the absence of a direct buy-sell relationship. FFI made specific representations, in writing, about the quality of the onions that it would supply to Bay Valley. FFI then entered into a business relationship with Kramer, which would buy the onions from FFI and then sell them to Bay Valley. This supply chain was directly contemplated in specific contracts executed between Bay Valley and FFI—most notably, a Continuing Product Guaranty executed by FFI's sales manager, Joe Davis. The Court will address the specific language of this guaranty in greater detail in the sections addressing how that language aligns with Bay Valley's various claims against FFI.

### 2. Breach of contract (Count 7)

Bay Valley seeks summary judgment against Kramer on its breach of contract claim (count 7). According to Bay Valley, the purchase orders for the onions contain clear terms and conditions regarding the quality of goods to be delivered:

> WARRANTIES. Seller warrants to Buyer . . . [t]hat the Goods, including packaging, will: (a) conform to the descriptions, drawings, specifications and standard of Buyer, (b) be of good material, quality, design and workmanship, (c) free from defects . . . , (d) will be safe and fit for the ordinary purpose for which the Goods are used and for which Buyer intends; will be merchantable and pass without objection in the trade; will run without variation and be of even kind, quality and quantity within each unit and among all units; and will comply with all federal, state, municipal and local laws, rules, regulations, ordinances and directions existing at the time of delivery . . . in accordance with the applicable regulations promulgated under the Federal Food, Drug and Cosmetic Act (the "Act").

Bay Valley's SOF, Ex. 13 ¶ 2. Another provision in the purchase orders states that by accepting the contract, "Seller agrees to fully comply with the Terms and Conditions." *Id.*, Ex. 13 ¶ 1. Bay Valley contends that it received onions that contained metal fragments, thereby violating the above warranties that the goods will be free from defects and safe for use in accordance with the Food, Drug, and Cosmetic Act (FDCA). Bay Valley argues that no material facts are genuinely disputed and that it is entitled to summary judgment on its claim that Kramer breached the terms of its contract.

Kramer, in response, contends that the purchase orders relied upon by Bay Valley do not establish that Kramer is the "Seller," and that as a result Kramer is not bound by the purchase orders' terms and conditions. Kramer asserts multiple arguments on this front. Its first and second arguments largely overlap: according to Kramer, it never accepted the terms and conditions in the purchase orders, and FFI is the true seller according to the purchase orders' terms. Kramer points to the "Offer &

16

Acceptance" provision on the purchase orders, which states that "[d]elivery to Buyer of the goods, products, articles or services . . . covered by this Purchase Order constitutes, *but is not the sole form of*, acceptance of the Terms and Conditions by Seller." *Id.*, Ex. 13 ¶ 1 (emphasis added). Kramer contends that, because it did not deliver the onions to Bay Valley, it never accepted the terms of the purchase orders. Kramer argues that, by contrast, FFI did deliver the onions and undertook other actions that Kramer contends establish that FFI was the seller under the purchase orders' terms.

These arguments are a non-starter. The purchase orders, as just quoted, state that delivery of the goods is one permissible form of acceptance but not the sole form. Therefore, whether Kramer delivered the onions to Bay Valley is not dispositive on whether it is the seller and thus bound by the purchase orders' terms and conditions. Further, Kramer's contention that the purchase orders' terms required certain actions related to packaging and shipping are unsupported by the actual language of the purchase orders. Specifically, Kramer asserts that the purchase orders "impose detailed requirements on the 'Seller' to package, inspect, and deliver the onions." Kramer's Mem. of L. at 14 (dkt. 89). Simply put, the purchase orders contain no such requirements. According to the terms and conditions, the only specific action directed to the "Seller" regarding packaging and shipping is that the "Seller will properly label all units with Seller's name, description of Goods, PO number, and any other identifying information Buyer requires." Bay Valley's SOF, Ex. 13 ¶ 5. Although the purchase orders do have other requirements for packaging and shipping, they are silent on who must complete these actions. Further, the purchase orders expressly contemplate that Kramer may enlist third parties to help ensure it can meet the terms and conditions.

17

*See id.*, Ex. 13 ¶ 2(c) ("Seller will ensure that Seller's employees, and agents and subcontractors comply with these Terms and Conditions, and, when on Buyer's premises, Buyer's safety and security requirements."); *id.*, Ex. 13 ¶ 16 ("Seller shall be in compliance with, and shall require its subcontractors and any person under its control to comply with, all applicable local, state, national, and international laws . . . ."). As a final point, the purchase orders also state that "Seller shall issue a separate invoice (in duplicate) for each shipment made against this Purchase Order." *Id.*, Ex. 13 ¶ 4. In response to the purchase orders sent to Kramer by Bay Valley, Kramer sent to Bay Valley "Sales Order[s]" that confirmed the quantity of onions, expected delivery date, and delivery location. *See id.*, Ex. 14. Those "Sales Orders" look like invoices to the Court, and they are a pretty clear indication that Kramer considered itself as a "Seller." Kramer became the seller, at the very latest, when it sent Bay Valley invoices and accepted payment for them. *See* Tr. of July 1, 2025 Hr'g at 8:14–16 ("Kramer invoiced Bay Valley for the full amount of the onions plus transportation costs. Bay Valley paid Kramer the full amount.").

Kramer next contends that it is not the seller because the purchase orders define "seller" in a circular manner: "This Purchase Order is an offer from the Buyer named on the front side hereof ('Buyer') to the *Seller listed on the front side hereof ('Seller')*." Bay Valley's SOF, Ex. 13 ¶ 1 (emphasis added). The problem, according to Kramer, is that the front side of the purchase orders do not actually list anyone as the "Seller" as such. *See id.*, Ex. 13 at 1. Kramer is correct that the front side of the purchase orders lists a "Buyer," but the term "Seller" does not appear. *See id.*, Ex. 13 at 1. Kramer therefore argues that the purchase orders are ambiguous, requiring extrinsic evidence to decipher

18

their meaning.

Bay Valley responds by arguing that the purchase orders include a "Vendor Address," indicate "Kramer Corp of Georgia" as the vendor, and list Kramer's Thomasville, Georgia address as the vendor address. *Id.*, Ex. 13 at 1. And "vendor" is a virtual synonym for "seller." Because Kramer is listed as the vendor and is the only non-Bay Valley entity named on the purchase orders, Bay Valley contends that the purchase orders are not ambiguous in this respect.

Bay Valley has the better argument. Although Kramer is correct that the purchase orders do not list a "Seller" on the front using that particular term, the only reasonable reading is that the vendor listed on the front *is* the seller referenced in the terms and conditions on the back of the purchase orders. As Bay Valley rightly argues, the only non-Bay Valley entity listed on the purchase orders is Kramer, and Black's Law Dictionary defines "vendor" as "a seller." *See Vendor*, Black's Law Dictionary (12th ed. 2024) (defining "vendor" as "[a] seller, usu[ally] of real property").

Kramer contends that, should the Court determine that it is the seller, it would be unconscionable to hold it to the terms and conditions of the purchase orders. "Under Illinois law, a contractual provision may be unconscionable on either procedural or substantive grounds." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777 (7th Cir. 2014) (citing *Razor v. Hyundai Motor Am.*, 222 Ill. 2d 75, 99, 854 N.E.2d 607, 622 (2006)). "[U]nconscionable contractual provisions are invalid." *Id.* at 778. Kramer challenges the terms of the purchase orders as both procedurally and substantively unconscionable.

"Procedural unconscionability refers to a situation where a term is so difficult to

find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Id.* (quoting *Razor*, 222 Ill. 2d at 99, 854 N.E.2d at 622). Put differently, a finding of procedural unconscionability turns on a consideration of factors related "to fairness in the formation of the contract, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." *Glen Ellyn Pharmacy, Inc. v. Meda Pharms., Inc.*, No. 09 C 4100, 2012 WL 3580688, at *4 (N.D. Ill. Aug. 16, 2012). These factors are "applied flexibly" and require a "highly fact-sensitive examination." *Id.*

Kramer contends that Bay Valley asked Kramer for a "favor" by having it serve as the broker for the sale of onions from FFI to Bay Valley. Kramer further contends that Bay Valley assured Kramer that it was serving only as a broker for the transaction "during the formation of the Broker Agreement." Kramer's Mem. of L. at 16. Kramer further argues that, based on its understanding that it was serving only as a broker, it did not have the opportunity to understand the terms of the purchase orders that Bay Valley seeks to impose.

Kramer's contention that it entered into a so-called "Broker Agreement" with Bay Valley or FFI is not supported by the record. Based on Kramer's briefing, it is implied that a physical contract exists—Kramer continuously references an "Agreement," using a capital "A." When questioned during the motion hearing, however, Kramer clarified that this alleged "Agreement" was merely a verbal agreement and that "[t]here is no actual document." Tr. of July 1, 2025 Hr'g at 46:6.

Based on this concession, and in consideration of other pertinent factors, the

Court concludes that enforcing the terms of the purchase orders against Kramer would not be procedurally unconscionable. Any contention that Kramer was operating under a different belief about its role in the transaction and thus did not have an understanding of the terms in the purchase orders is unsupported and unpersuasive. Kramer is a sophisticated business entity whose business requires entering into agreements with other business entities. Further, nothing in the briefs indicates that Kramer was not in a fair bargaining position or that the terms of the deal were otherwise hidden. Though written in small print, the terms are legible without magnification. There is no genuine factual dispute; holding Kramer to the terms of the purchase orders is not procedurally unconscionable.

Substantive unconscionability "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Jackson*, 764 F.3d at 778 (quoting *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 28, 857 N.E.2d 250, 267 (2006)). Contract terms may be substantively unconscionable if they are "so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Id.* (quoting *Kinkel*, 223 Ill. 2d at 28, 857 N.E.2d at 267).

Kramer contends that it would be substantively unconscionable to hold it responsible for food safety under the purchase orders because it "does not and cannot perform food quality control" (a fact that Kramer asserts Bay Valley is aware of), was not required "to submit any quality control documents," and never had physical control of

the onions.  Kramer's Mem. of L. at 17.[3]

Kramer's arguments regarding substantive unconscionability are unpersuasive. Whether Kramer is able to conduct food safety quality control itself has no bearing on whether terms in the purchase orders related to its duties are so one-sided as to be oppressive or surprising (if nothing else, Kramer could have hired or retained someone to perform this function).  Kramer was fully able to read and understand the terms and conditions contained in the purchase orders.  If it wished to reject or alter them, the time to do so was prior to acceptance and performance.  There is no unfair surprise in holding a sophisticated business entity like Kramer to the terms of a contract that it agreed to.  Nor does it result in an imbalance in the obligations and rights imposed by the bargain.  Warranty clauses like the one contained in the purchase orders are common, and the one here seeks to hold Kramer to duties imposed by federal and state law.  There is nothing unbalanced about seeking to ensure Kramer adheres to the obligations owed under the law.  Kramer knew at the time of contracting that it lacked the personnel to conduct food safety quality control, yet it elected to enter into an agreement with Bay Valley to supply it with onions.  Again, there is no genuine factual dispute; the purchase orders are not substantively unconscionable.

Finally, Kramer argues that Bay Valley barred it from performing the seller's duties, thereby relieving it of liability under the doctrine of prevention.  The Court will address this argument in full below, as Kramer largely adopts this argument from FFI's submissions.

---

[3] Kramer also asserts arguments related to the alleged "broker agreement."  The Court will not address these arguments, having determined that no such agreement exists based on the lack of any support in the record.

Putting aside arguments related to the prevention doctrine, the Court is not persuaded by any of Kramer's arguments regarding the breach of contract claim. As the Court will explain in greater detail in the sections of this opinion addressing breach of express and implied warranties, Bay Valley has shown that Kramer breached the terms and conditions of the purchase orders. No genuine dispute of material fact exists otherwise, and therefore Bay Valley is entitled to summary judgment in its favor for count 7. For these same reasons, the Court denies Kramer's motion for summary judgment on count 7.

Having determined that Kramer is controlled by the terms of the purchase orders, the Court notes that the purchase orders contain a choice-of-law provision: "The Purchase Order and the transaction in connection herewith shall be governed by the laws of the State of Illinois." Bay Valley's SOF, Ex. 13 ¶ 19. Accordingly, the Court will apply Illinois law to all of Bay Valley's claims against Kramer.

### 3. Implied warranty of merchantability (Counts 3 & 4)

The Illinois Uniform Commercial Code (UCC) provides that, "[u]nless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 810 ILCS 5/2-314(1). To succeed on a claim for breach of the implied warranty of merchantability, a plaintiff must show that "(1) the defendant sold goods that were not merchantable at the time of sale; (2) the plaintiff suffered damages as a result of the defective goods; and (3) the plaintiff gave the defendant notice of the defect." *Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, No. 14 C 1512, 2017 WL 1105400, at *16 (N.D. Ill. Mar. 24, 2017) (quoting *Baldwin v. Star Sci., Inc.*, 78 F. Supp. 3d 724, 741 (N.D. Ill. 2015)).

Goods are merchantable, in pertinent part, if they "(a) pass without objection in the trade under the contract description; . . . (c) are fit for the ordinary purposes for which such goods are used; and . . . (f) conform to the promises or affirmations of fact made on the container or label if any."  810 ILCS 5/2-314(2).

Bay Valley contends that the ordinary purpose of a food product like the onions at issue is human consumption and that food containing metal is not fit for consumption. To support this contention, Bay Valley relies in part on a section of the FDA Compliance Policy Guide titled "Foods, Adulteration Involving hard or Sharp Foreign Objects," which states that "[h]ard or sharp foreign objects in food may cause traumatic injury including laceration and perforation of tissues of the mouth, tongue, throat, stomach and intestine as well as damage to the teeth and gums."  FDA, CPG Sec. 555.425 Foods, https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-555425-foods-adulteration-involving-hard-or-sharp-foreign-objects.

The parties dispute only whether Bay Valley has established the first element—non-merchantability—though under differing rationales.  Kramer contends that it did not "s[ell] goods" to Bay Valley and thus cannot be liable for any implied warranty, including an implied warranty of merchantability.  Kramer asserts that it was only a broker that helped to connect FFI, the true seller of the onions, to Bay Valley.

For the reasons previously discussed, Kramer's argument is unavailing.  As the Court has concluded, Kramer is the seller of the onions under the purchase orders, and it is therefore bound by the terms and conditions of those purchase orders.  As noted above, the purchase orders contain express warranties, including a warranty that the onions "will be safe and fit for the ordinary purpose for which the Goods are used and

24

for which Buyer intends" and "will be merchantable."  Bay Valley's SOF, Ex. 13 ¶ 2.

Therefore, the only question remaining to determine Kramer's liability is whether the

onions are merchantable within the meaning of the Illinois UCC.  Kramer, however,

argues only that summary judgment in its favor is proper because it is not the seller.  It

does not present any contention that the onions did not breach the implied warranty of

merchantability.  This leads the Court to FFI's arguments on the issue.

FFI contends that because Bay Valley decided to use some of the onions in its

salsa, that means all the onions were merchantable.  This argument is not persuasive

and invokes the adage that "two wrongs do not make a right."  That Bay Valley elected

to distribute salsa produced using adulterated onions may say something about Bay

Valley's appetite for risk, but it has no bearing on whether the onions provided by FFI

were merchantable.

FFI further contends that, when looking to the specific language of the Illinois

UCC, the onions are merchantable.  None of these arguments are persuasive.  For

instance, FFI argues that the onions pass without objection under the contract

description, which permits defects in the onions so long as the total defects, based on

the "Quality Parameters," account for less than 0.5% of the total product.  FFI contends

that only seventeen metal fragments were found in 410,000 pounds of onions, and

therefore the total metal was less than 0.5%.

This argument, put simply, is incorrect.  The "Quality Parameters" apply to

*onions*, not to other material in the onions.  These parameters allow for 0.5% of the

product not to conform to the specified size of the chopped, dehydrated onions; they do

not create a blanket allowance for foreign material up to 0.5% to be included in the

25

onions. FFI's argument stretches the language of the Quality Parameters beyond recognition.

FFI also argues that the onions themselves were of fair, average quality and were adequately packaged and labeled. *See* 810 ILCS 5/2-314(2)(b), (e). Fine. But the requirements for goods listed under the Illinois UCC's implied warranty of merchantability use "and" after each factor, meaning that a good is merchantable only if it comports with *every* listed requirement. The fact that the onions comport with some, but not all, of the factors listed does not mean they were merchantable.

The Court concludes that FFI breached the implied warranty of merchantability because they supplied Bay Valley with onions that were, at least, not fit for their ordinary purpose. The ordinary purpose of wholesale food products is consumption, and that was the intended use of the onions here. Onions containing metal fragments are not fit for human consumption. Ingesting a metal fragment one inch long—regardless of whether that metal fragment is the only such piece in the entire shipment—is potentially injurious to one's health. This is all that is required to find a breach of the implied warranty of merchantability. Further, because the metal fragments were found in unopened, sealed containers of onions, there is no genuine dispute that the onions contained metal when they left the India-based manufacturers, and accordingly when they passed down the supply chain from FFI and Kramer to Bay Valley. For these reasons, Kramer has also breached the implied warranty of merchantability. No reasonable fact-finder could find otherwise.

For these reasons, Bay Valley is entitled to summary judgment against Kramer and FFI on counts 3 and 4 of its complaint. Accordingly, the Court denies Kramer and

FFI's motions for summary judgment on these counts.

    **4.    Breach of express warranties (Counts 1 & 2)**

    The Illinois UCC provides that a seller of goods creates an express warranty, among other means, via "[a]ny affirmation of fact or promise by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain . . . ."  810 ILCS 5/2-313(a).  Such an affirmation "creates an express warranty that the goods shall conform to the affirmation or promise."  *Id.*

    The Court has already addressed the express warranties to Bay Valley contained in the purchase orders executed by Kramer.  Based on the above analysis, these warranties apply to Kramer.  It is undisputed that at least some of the packages of onions contained metal fragments, and it is not genuinely disputed that these metal fragments made the onions unsafe for the ordinary purpose of human consumption.  As outlined earlier, this means that there is no genuine dispute that Kramer breached the implied warranty of merchantability.  The express warranty in the purchase orders provides that Kramer, as the seller, will ensure that the onions delivered "will be safe and fit for the ordinary purpose for which the Goods are used and for which Buyer intends" and "will be merchantable."  Bay Valley's SOF, Ex. 13 ¶ 2.  There is no genuine dispute of material fact; Kramer breached the express warranties contained in the purchase orders.  Accordingly, Bay Valley is entitled to summary judgment against Kramer on count 1.

    Likewise, as outlined earlier, FFI also breached the implied warranty of merchantability for the same reason as Kramer:  it delivered onions to Bay Valley as part of the supply chain, and there is no genuine dispute that those onions contained

the metal fragments at issue when they left FFI's control. The Continuing Product Guaranty executed by FFI's Joe Davis contains the following express warranty: "[FFI] guarantees that no articles of food, packaging materials or other products . . . sold by Supplier to Bay Valley Foods, LLC . . . will be adulterated or misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act . . . ." Bay Valley's SOF, Ex. 6.

FFI contends that Bay Valley prevented it from honoring this express warranty and thus it should be excused from liability. Specifically, FFI argues that it was unable to ensure that the onions did not contain any foreign materials because "Bay Valley would have rejected any of the onions that FFI opened for inspection." FFI's Consol. Mem. in Opp. to Bay Valley's Mot. for Summ. J. & in Supp. of FFI's Mot. for Summ. J. at 3. FFI further argues that Bay Valley "did not expect FFI to do anything other than store the sealed containers at FFI's warehouse." *Id.* at 3–4.

"In contract law, the general principle known as the doctrine of prevention provides that, 'if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused.'" *Tabatabai v. W. Coast Life Ins. Co.*, 664 F.3d 663, 666 (7th Cir. 2011) (citation omitted); *see also Barrows v. Maco, Inc.*, 94 Ill. App. 3d 959, 966, 419 N.E.2d 634, 639 (1981) ("A party to a contract may not complain of the nonperformance of the other party where that performance is prevented by his own actions."). The prevention doctrine "applies *only if the failure to perform was not caused by the prevented party's own inability to perform.* In other words, absent the prevention, the prevented party must otherwise have been able to perform." *Solidarity Ltd. v. JeffEx, LLC*, No. 20 C 1456, 2023 WL 2683215, at *7 (N.D. Ill. Mar. 29, 2023) (citation omitted).

28

The Court is not persuaded that the prevention doctrine applies here. FFI offers no evidence that it was *actually* prevented by Bay Valley from performing inspections.[4] And that aside, whether FFI was able to open the onions to inspect for metal fragments has no bearing on whether it breached the express warranty described above. The plain language of a contract controls, and the Continuing Product Guaranties require FFI to ensure that the onions delivered are not adulterated within the meaning of the FDCA.

The FDCA provides:

> A food shall be adulterated . . . (1) [i]f it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health[; or] (2)(A) if it bears or contains any added poisonous or added deleterious substance . . . that is unsafe within the meaning of section 346 of this title . . . .

21 U.S.C. § 342(a). Section 346, in turn, states:

> Any poisonous or deleterious substance added to any food, except where such substance is required in the production thereof or cannot be avoided by good manufacturing practice shall be deemed to be unsafe for purposes of the application of clause (2)(A) of section 342(a) of this title . . . .

21 U.S.C. § 346 (titled "Tolerance for poisonous or deleterious substances in food; regulations"). Merriam-Webster defines deleterious as "harmful often in a subtle or unexpected way" and lists as synonyms "harmful, detrimental, adverse, damaging, [and] dangerous." *Deleterious*, Merriam-Webster, https://www.merriam-webster.com/dictionary/deleterious (last checked Aug. 7, 2025).

The plain language of the FDCA leads the Court to conclude that the metal

---

[4] If nothing else, FFI could have done this, or caused it to be done, in India before or at the time of packaging.

fragments in the onions make the onions adulterated within the meaning of the statute.

Under section 342(a)(1), a food is adulterated if it contains *any* poisonous or deleterious

material that *may* render it injurious to health. The dictionary definition of deleterious is

harmful. There is no genuine dispute that chewing or ingesting a metal fragment

approximately one inch long *may* harm the individual chewing or ingesting it. Assuredly,

even FFI's FDA expert, Jennifer Ahearn, testified during her deposition that a food "is

adulterated if it has metal in it." Ahearn Dep. at 189:22; *see also id.* at 67:15–20 ("I

don't disagree that there was foreign material present in the dehydrated onions. It is

adulterated in the meaning of the FD&C Act.").

FFI contends that section 342(a)(1) includes an exception: "in case the

substance is not an added substance such food shall not be considered adulterated

under this clause if the quantity of such substance in such food does not ordinarily

render it injurious to health." 21 U.S.C. § 342(a)(1). According to FFI, Bay Valley's

decision to continue incorporating some of the onions into salsa and then distributing

that finished salsa for sale means there is no genuine dispute that the metal did not

"render [*the salsa*] injurious to health."

For reasons already stated, the Court is not persuaded by this argument. Most

obviously, the metal *is* an added substance, so it's unclear whether the exception in the

FDCA applies in the first place. But even if it does, the "food" at issue is not the finished

salsa, but the onions that were delivered in violation of the express undertaking that

they would be free from foreign materials that render them unfit for their ordinary

purpose. The Court has already explained why metal fragments in onions render them

injurious to health and unfit for their ordinary purpose. There is no genuine factual

dispute; Kramer and FFI breached the express warranties.  The Court therefore denies

Kramer and FFI's motions for summary judgment on counts 1 and 2.  Bay Valley is

entitled to summary judgment on counts 1 and 2 of its amended complaint.

### 5.    Implied warranty of fitness for a particular purpose (Counts 5 & 6)

Illinois's UCC establishes an implied warranty that goods sold for a particular

purpose shall be fit for that purpose.  *See* 810 ILCS 5/2-315.  Though Bay Valley has

not moved for summary judgment on its claims invoking this provision, FFI and Kramer

have.  The Illinois UCC states:

> Where the seller at the time of contracting has reason to know any particular
> purpose for which the goods are required and that the buyer is relying on
> the seller's skill or judgment to select or furnish suitable goods, there is
> unless excluded or modified under the next section an implied warranty that
> the goods shall be fit for such purpose.

*Id.*  A comment to the Illinois UCC provides the following guidance:

> A "particular purpose" differs from the ordinary purpose for which the goods
> are used in that it envisages a specific use by the buyer which is peculiar to
> the nature of his business whereas the ordinary purposes for which goods
> are used are those envisaged in the concept of merchantability and go to
> uses which are customarily made of the goods in question.  For example,
> shoes are generally used for the purpose of walking upon ordinary ground,
> but a seller may know that a particular pair was selected to be used for
> climbing mountains.

*Id.* cmt. 2.  Accordingly, "[n]o warranty for a particular purpose is created if the intended

use is no different from the ordinary use of the product."  *Bayer HealthCare LLC v.

Aeropres Corp.*, 727 F. Supp. 3d 738, 754 (N.D. Ill. 2024) (quoting *CHS Acquisition

Corp. v. Watson Coatings, Inc.*, No. 17 C 4993, 2018 WL 3970137, at *6 (N.D. Ill. Aug.

20, 2018)); *see also Wilson v. Massey-Ferguson, Inc.*, 21 Ill. App. 3d 867, 869–70, 315

N.E.2d 580, 582 (1974).

FFI contends that the ordinary use of dehydrated chopped onions is also the

intended use by Bay Valley—"as one of many ingredients in various food products."
FFI's Consol. Mem. in Opp. to Bay Valley's Mot. for Summ. J. & in Supp. of FFI's Mot.
for Summ. J. at 26. FFI therefore argues that no genuine dispute exists regarding Bay
Valley's claim for breach of the implied warranty of fitness for a particular purpose and
that FFI should be granted summary judgment on this count.

The Court agrees with FFI. Bay Valley does not respond to FFI's argument in its
reply brief, and in its complaint it alleges only that the onions "were not fit for the
purpose of being incorporated into consumer food products intended for sale and
human consumption." First Am. Compl. ¶ 87. But using the onions to produce food
products, without more, does not state a "particular" purpose for the onions—rather,
using a food product as an ingredient to produce food for human consumption is the
ordinary purpose of such a product. This is not an instance, in line with the comment to
Illinois's UCC, in which Bay Valley represented that it needed particular types of onions
for a specific use, like producing salsa using onions only from a certain region, or using
only a certain type (i.e., yellow onions vs. red onions).

In Kramer's motion, its sole argument for summary judgment on the parallel
warranty-of-fitness claim made against it (count 5), is that it did not sell onions to Bay
Valley, an argument the Court has elsewhere rejected. *See* Kramer's Mem. of L. at 11.
But Count 5 nonetheless fails as to Kramer, for the same reason (just discussed) that
the parallel claim against FFI (count 6) fails. The Court therefore grants summary
judgment in favor of Kramer on count 5. (If Bay Valley has a merits-based reason why
count 5 should be treated differently from count 6, it should promptly bring this to the
Court's attention via a motion for reconsideration.

32

In short, the defendants are entitled to summary judgment on counts 5 and 6 of Bay Valley's complaint.

### 6.    Express indemnification (Counts 8 & 9)

The Court has already found that Kramer is the "Seller" of the onions and is therefore bound by the terms and conditions set forth on the back of the purchase orders.  Those terms and conditions contain an indemnification provision that states, in pertinent part:

> Seller shall defend, indemnify and hold harmless Buyer . . . against all damages, liabilities, claims, losses and expenses, including without limitation attorneys' fees, loss of production time and lost profits, arising out of, or resulting in any way from:  any defect in the Goods, any breach of the Terms and Conditions or any expressed or implied warranty, or any negligent act or omission of Seller or of its agents or contractors.

Bay Valley's SOF, Ex. 13 ¶ 12.  As explained above, Kramer breached both express and implied warranties when it sold onions containing metal fragments to Bay Valley. There is no genuine factual dispute; Kramer owes Bay Valley a duty to indemnify it for losses resulting from the delivery of adulterated onions per the terms set forth above. Bay Valley is entitled to summary judgment on count 8.  For the same reasons, the Court denies Kramer's motion for summary judgment on this claim.

The Court has also found that FFI executed a Continuing Product Guaranty with Bay Valley with an effective date of December 17, 2014.  *See* Bay Valley's SOF, Ex. 6. The guaranty includes a provision stating that "[t]his guaranty is continuing and shall remain in full force and effect until Supplier notifies the Company of its intention to revoke same."  *Id.*, Ex. 6.  FFI does not argue that it notified Bay Valley of any intention to revoke this guaranty, and thus it remains in effect.  The guaranty requires FFI to

> defend, indemnify and hold harmless the Company . . . from any claim,

33

damage, suit, loss or expense (including reasonable attorney fees) arising out of the testing, purchase, use, consumption, sale or resale of Supplier Product(s) supplied, developed, or designed by Supplier, including but not limited to claims of negligence, breach of warranty and product liability.

*Id.*, Ex. 6. The Court has found that FFI breached both express and implied warranties made to Bay Valley when, as part of the supply chain, it delivered adulterated onions containing metal fragments. Again, there is no genuine factual dispute; Bay Valley is entitled to summary judgment on count 9 and FFI is not.

*                    *                    *

To summarize, the Court grants summary judgment in favor of Bay Valley and against Kramer on counts 1, 3, 7, and 8; grants summary judgment in favor of Bay Valley against FFI on counts 2, 4, and 9; in favor of FFI against Bay Valley on count 6 and favor of Kramer against Bay Valley on Count 5. The Court otherwise denies the motions for summary judgment.

**B.      Kramer & FFI's motions for summary judgment on Kramer's crossclaim**

The Court will next address Kramer and FFI's cross-motions for summary judgment regarding Kramer's crossclaim against FFI. Kramer asserts four claims against FFI: express indemnity (Count 1), implied indemnity (Count 2), breach of the implied warranty of merchantability (Count 3), and breach of the implied warranty of fitness for a particular purpose (Count 4).

**1.      Express & implied indemnity (Counts 1 & 2)**

Kramer asserts claims against FFI for both express and implied indemnity for any damages or loss resulting from the metal-contaminated onions. To support its claim for express indemnity, Kramer contends that FFI and Kramer executed a "contract . . . under which Kramer agreed to act as FFI's broker to sell FFI's onions to Bay Valley

34

('Agreement')." Kramer's Crosscl. Against FFI ¶ 10. According to Kramer, "pursuant to the Agreement, FFI also agreed to indemnify and hold Kramer harmless for any loss, cost, damage, and expense arising from FFI's failure to satisfy its obligations to (a) provide safe onions and (b) confirm their safety through required inspections and quality control." *Id.* ¶ 16.

The Court has already addressed why Kramer's argument regarding the non-existent "Broker Agreement" is unpersuasive.

Kramer next argues that FFI admitted liability for the metal-contaminated onions and repeatedly assured Kramer that FFI would indemnify it for any loss. According to Kramer, FFI "admitted liability during a conference call" and stated that "(as the supplier) [it] would 'handle the situation.'" Kramer's Mem. in Supp. of Mot. for Summ. J. Against FFI at 8. Kramer contends that this amounts to a binding agreement for express indemnity. *Id.* Kramer further asserts that an email from Bay Valley supports this position; following the conference call, Kramer contends that Bay Valley "internally documented" FFI's admission of liability and agreement to expressly indemnify Kramer. *Id.* at 9.

FFI argues that the statements that it would "handle the situation" were merely an indication that it would handle communications with and investigation of Fivestar, the India-based supplier where a portion of the onions at issue originated. According to FFI, it made this representation because it is "the importer of this material, and the direct link with the Factory in India." FFI's Consol. Mem. in Opp. to Kramer's Mot. for Summ. J. & in Supp. of FFI's Mot. for Summ. J. at 7. FFI also asserts that the Bay Valley email states only what Bay Valley thinks regarding FFI's liability and "does not

reference any statement from FFI that it agreed to indemnify Kramer or accept all responsibility for damages relating to the metal." *Id.* at 8.

Kramer's argument that this amounts to an express indemnification agreement by FFI for loss related to the metal-contaminated onions is not persuasive. Kramer does not point to any statement *by FFI* that would serve as a binding agreement to indemnify, and absent any such agreement there is no genuine dispute regarding whether FFI agreed to expressly indemnify Kramer.

Even if the Court's above analysis is incorrect, Kramer concedes that "discovery showed that FFI and Kramer 'failed to include an indemnity provision.'" Kramer's Combined Reply Against & Resp. to FFI at 7 n.5. Based on this concession, "Kramer does not oppose FFI's request for judgment on the express indemnity claim." *Id.* Accordingly, the Court grants summary judgment in favor of FFI for count 1 of Kramer's crossclaim and denies Kramer's motion for summary judgment on this count.

An implied indemnity claim is available "where the parties have failed to include an indemnity provision in an agreement, and there is reason for a court to read such a provision into the agreement." *Mizuho Corp. Bank (USA) v. Cory & Assocs., Inc.*, 341 F.3d 644, 652 (7th Cir. 2003). "The underlying principle is that the party that is in the better position to avoid liability is given an incentive to do so by being made responsible for the consequences." *Id.* (quoting *Jinwoong, Inc. v. Jinwoong, Inc.*, 310 F.3d 962, 965 (7th Cir. 2002)). The Seventh Circuit has clarified that "implied indemnity actions lie only where one party is in some sense 'at fault,' and the other party is blameless though liable—typically because of strict liability, *respondeat superior*, implied warranty, or some other legal principle that imposed liability regardless of fault." *Id.*

36

Here, the Court finds that FFI was not only in the better position to avoid liability, but that it was the only party with any actual control over where the onions were sourced, how they would be packaged, and where they would be stored. It is undisputed that FFI worked with Bay Valley to select Fivestar as the supplier, and it is further undisputed that FFI was the sole party with knowledge that it was sourcing onions from an unapproved supplier: Pardes. FFI executed certain contracts and guaranties with Bay Valley promising that the sourced onions would adhere to certain quality-control standards and would be packaged and shipped appropriately by Fivestar (and, unknown to Bay Valley, by Pardes). Finally, the onions were either delivered directly to Bay Valley's plants in Texas and Canada or stored in FFI's warehouse before Bay Valley took possession of them. At no point did Kramer have any ability to direct or control how the supply process might function such that it could be "in some sense at fault." Rather, Kramer is liable because it breached certain express and implied warranties contained in the purchase orders it executed with Bay Valley. These facts lead the Court to find that FFI owes Kramer an implied duty to indemnify Kramer for losses resulting from the metal-contaminated onions. No reasonable fact-finder could find otherwise.

The Court therefore grants summary judgment in favor of Kramer on count 2 of its crossclaim against FFI and denies FFI's motion for summary judgment on count 2 of the crossclaim.

## 2.    Implied warranty of merchantability (Count 3)

Kramer contends that if it was not a broker between FFI and Bay Valley, then "the only remaining option is that Kramer was an actual buyer of FFI's contaminated

37

onions."  Kramer's Mem. in Supp. of Mot. for Summ. J. Against FFI at 9.  If Kramer is an actual buyer of the onions, it argues, then "FFI breached the implied warranty of merchantability when it sold Kramer contaminated onions."  *Id.* at 10.

FFI asserts the same arguments in response as it levels against Bay Valley: that, after considering the factors listed in Illinois's Commercial Code, the onions were merchantable.  *See* 810 ILCS 5/2-314(2).  For the same reasons as explained earlier, these arguments are unpersuasive.  It is undisputed that onions still in sealed containers were delivered to Bay Valley containing metal fragments.  It is further undisputed that Kramer did not open or otherwise inspect the onions and that the onions were either delivered directly to Bay Valley's facilities or held at FFI's warehouse prior to Bay Valley taking possession of them.  Therefore, any metal fragments in the unopened containers would have been present when FFI sold the onions to Kramer as part of the supply chain.  There is no genuine dispute otherwise.  Accordingly, FFI breached the implied warranty of merchantability to Kramer when it sold Kramer onions that were not fit for their ordinary purpose.  Summary judgment is therefore properly granted in favor of Kramer on count 3 of its crossclaim against FFI; accordingly, FFI's motion for summary judgment on count 3 of Kramer's crossclaim is denied.

### 3.    Implied warranty of fitness for a particular purpose (Count 4)

Finally, the Court finds that FFI is entitled to summary judgment in its favor on count 4 of Kramer's crossclaim alleging breach of the implied warranty of fitness for a particular purpose.  As noted above, the implied warranty of fitness for a particular purpose requires a showing that the seller has knowledge that the goods at issue were sold for a particular purpose, as opposed to the goods' ordinary purpose.  "No warranty

for a particular purpose is created if the intended use is no different from the ordinary use of the product." *Bayer HealthCare*, 727 F. Supp. 3d at 754 (citation omitted). The ordinary use of the onions is human consumption, and that is the purpose for which they were intended. No genuine dispute of fact exists to the contrary. Therefore, the Court grants summary judgment on count 4 of Kramer's crossclaim in favor of FFI and denies Kramer's motion for summary judgment on this count.

## Conclusion

In conclusion, the Court: (a) grants Bay Valley's motion for summary judgment on counts 1, 3, 7, and 8 against Kramer and on counts 2, 4, and 9 against FFI [dkt. 73]; (b) grants FFI's motion for summary judgment on count 6 and otherwise denies FFI's motion [dkt. 81]; (c) grants Kramer's motion for summary judgment on count 5 and otherwise denies the motion [dkt. 89]; (d) grants Kramer's motion for summary judgment on counts 2 and 3 of its crossclaim against FFI and otherwise denies Kramer's motion [dkt. 69]; and grants FFI's motion for summary judgment on counts 1 and 4 of Kramer's crossclaim and otherwise denies FFI's motion [dkt. 85]. The parties are directed to promptly confer regarding whatever further proceedings are needed to bring this matter to a conclusion. A joint status report with a proposed outline and schedule for further proceedings is to be filed on August 14, 2025. A telephonic status hearing is set for August 21, 2025 at 9:00 a.m., using call-in number 650-479-3207, access code 2305-915-8729.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 7, 2025